EDWARD DINDINGER, Idaho Bar No. 10144
Dindinger & Kohler, PLLC
P.O. Box 5555
Boise, Idaho 83705
Telephone: (208) 713-8620
E-mail: edward@dklawboise.com

*JONATHAN WOOD, DC Bar No. 1045015
TODD F. GAZIANO, Tex. Bar No. 07742200
Pacific Legal Foundation
3033 Wilson Blvd., Suite 700
Arlington, Virginia 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
E-mail: jwood@pacificlegal.org
E-mail: tgaziano@pacificlegal.org

*JEFFREY W. McCOY, Cal. Bar No. 317377
CALEB R. TROTTER, Cal. Bar No. 305195
*KAYCEE M. ROYER, Cal. Bar No. 317397
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
E-mail: jmccoy@pacificlegal.org
E-mail: ctrotter@pacificlegal.org
E-mail: kroyer@pacificlegal.org
*Pro Hac Vice Pending

Attorneys for Plaintiff Tugaw Ranches, LLC

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TUGAW RANCHES, LLC,<br><br>                        Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF INTERIOR;<br>RYAN ZINKE, in his official capacity as<br>Secretary of Interior; BUREAU OF LAND<br>MANAGEMENT; BRIAN STEED, in his | Case No. _____<br><br>**COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

1

official capacity as Deputy Director of the
Bureau of Land Management; U.S.
DEPARTMENT OF AGRICULTURE;
SONNY PERDUE, in his official capacity
as Secretary of Agriculture; U.S. FOREST
SERVICE; and VICTORIA C.
CHRISTIANSEN, in her official capacity
as Interim Chief of the Forest Service,

Defendants.

## INTRODUCTION

1.     To restore democratic accountability to the federal bureaucracy,
Congress enacted the Congressional Review Act (CRA) in 1996, requiring federal
agencies to submit every new rule they adopt to Congress before the rule goes into
effect. If our elected representatives disagree with an agency's rule, the CRA provides
streamlined procedures for Congress and the President to pass a resolution
disapproving the rule, which also prevents substantially similar rules from being
adopted in the future.

2.     Agency compliance with the CRA's submission requirement has been
spotty, a problem that the Congressional Research Service and Government
Accountability Office have long warned agencies about. Agency non-compliance with
the CRA's congressional reporting requirement was the subject of a hearing in the
U.S. House Judiciary Committee on September 28, 2016,[1] and the Senate

---

[1]   The Judiciary Committee's link to a video of the hearing, "Rulemakers Must Follow
the Rules, Too: Oversight of Agency Compliance with the Congressional Review Act,"
and the witnesses' written testimony, *available at* https://judiciary.house.gov/

Subcommittee on Regulatory Affairs Chairman sent a letter to the Director of Office of Management and Budget on December 5, 2017, expressing a similar concern with agency non-compliance with the CRA reporting requirement.[2] The statute is clear on the consequences of an agency's failure to comply: the rule cannot be implemented or given legal effect.

3.      The rule at issue in this case is the Bureau of Land Management (Bureau) and United States Forest Service's Records of Decision for the Great Basin Region Greater-Sage Grouse Sub-Regions of Idaho and Southwestern Montana; Nevada and Utah (Sage Grouse Rules). The controversial Sage Grouse Rules impose strict rangeland management requirements on Bureau and Forest Service lands and has been highly criticized by states, stakeholders, and scientists.

4.      Tugaw Ranches, LLC (the Ranch), runs cattle on several Bureau and Forest Service grazing allotments covered by the Sage Grouse Rules. It has already been subject to Forest Service monitoring pursuant to the rule and, as the rule is fully implemented, will suffer further restrictions on its grazing activities, driving up the cost of doing business.

5.      The Bureau and Forest Service did not submit the Sage Grouse Rules to Congress as required by the CRA. Although the CRA makes clear that unsubmitted

---

hearing/rulemakers-must-follow-rules-oversight-agency-compliance-congressional-review-act/.

[2] Letter from Senator James Lankford to Director Mick Mulvaney Regarding the Congressional Review Act, https://pacificlegal.org/wp-content/uploads/2018/04/2017-12-05-Sen-Lankford-to-Director-Mulvaney-re-CRA-Guidance-Documents.pdf.

rules cannot be given legal effect, the Forest Service is implementing its Sage Grouse Rules on the Ranch's allotments and plans to continue doing so, with increasing burdens on the Ranch. Because timely submission of the rule to Congress is agency action unlawfully withheld or unreasonably delayed, the Ranch seeks a declaration that the Forest Service and Bureau have violated the CRA and Administrative Procedure Act (APA). It also seeks an injunction requiring the Bureau and Forest Service to submit the rules to Congress.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); § 2201 (authorizing declaratory relief); § 2202 (authorizing injunctive relief); and 5 U.S.C. § 702 (providing for judicial review of agency action under the APA).

7.      Venue in this district is predicated upon 5 U.S.C. § 703 and 28 U.S.C. § 1391(e)(1). Venue in the District of Idaho is proper because this case concerns Bureau and Forest Service allotments located in southern Idaho.

## PARTIES

*Plaintiff*

8.      Plaintiff Tugaw Ranches, LLC, is a cattle ranching operation based out of Oakley, Idaho, in Cassia County. Three brothers, Douglas, Don, and David Pickett own the Ranch. The Ranch operates on a variety of private and public lands, including Bureau grazing allotments and Forest Service allotments that are affected by the Sage Grouse Rules. The Ranch runs cattle on two Forest Service grazing allotments

that have been subject to implementation of the Sage Grouse Rule on the Sawtooth National Forest within the Minidoka Ranger District, West Cassia Division: the Rock Creek Allotment and the Coal Pit Allotment. The Ranch relies upon these two allotments to feed their cattle in the summer months. For example, any significant changes to the Ranch's Forest Service grazing permits could result in cattle being left without feed for 1-4 weeks in the middle of grazing season or, ultimately, the loss of the permit entirely. This would not only place a huge financial burden on the Ranch but could also result in the Ranch going out of business entirely. Uncertainty about what additional requirements will be imposed pursuant to the Sage Grouse Rules also harms the Ranch's ability to plan for the entire grazing season and make investment decisions today necessary to provide sustainable grazing in future years. If the Sage Grouse Rules ultimately force the Ranch off any of its grazing allotments, it is unlikely to find adequate replacements without incurring much higher costs.

*Defendants*

9.     The Department of Interior (Interior) is an agency of the United States. Congress has charged Interior with managing federal lands.

10.    Ryan Zinke is the Secretary of Interior. He oversees Interior's management of federal lands and is sued in his official capacity only.

11.    The Bureau of Land Management is an agency of the Department of Interior. The Bureau has been delegated responsibility by the Secretary of Interior for the day-to-day management of federal lands.

12.     Brian Steed is the Deputy Director of Programs and Policy at the Bureau. He is exercising the Authority of the Director. He oversees the Bureau's management of federal lands and is sued in his official capacity only.

13.     The United States Department of Agriculture is an agency of the United States. Congress has charged the Department with managing federal forest lands.

14.     Sonny Perdue is the Secretary of Agriculture. He oversees the Department's management of federal forests and is sued in his official capacity only.

15.     United States Forest Service is an agency of the United States Department of Agriculture. The Forest Service has been delegated responsibility by the Secretary of the United States Department of Agriculture for the day-to-day management of federal forests.

16.     Victoria C. Christiansen is the Interim Chief of the United States Forest Service. She oversees the Service's management of federal forests and is sued in her official capacity only.

## BACKGROUND

### The Congressional Review Act

17.     The Senate and House sponsors of the CRA filed identical statements in the records of both Houses of Congress explaining the purpose of the statute. *See* 142 Cong. Rec. S3683 (Apr. 18, 1996) (joint statement of Sens. Nickles, Reid, and Stevens); 142 Cong. Rec. 6922-6926 (1996) (statement of Rep. Henry Hyde for the House sponsors and committees of jurisdiction). The CRA was enacted in recognition that excessive delegation had upset the "delicate balance between the appropriate roles of

the Congress in enacting laws, and the Executive Branch in implementing those laws. This legislation will help to redress the balance, reclaiming for Congress some of its policymaking authority, without at the same time requiring Congress to become a super regulatory agency." Cong. Rec. at S3683.

18.     By reclaiming that authority, Congress was restoring democratic accountability to the rulemaking process. "Rules can be surprisingly different from the expectations of Congress or the public. Congressional review gives the public the opportunity to call the attention of politically accountable, elected officials to concerns about new agency rules. If these concerns are sufficiently serious, Congress can stop the rule." *Id.* at S3684.

19.     The CRA provides for democratic accountability by requiring agencies to submit every rule they adopt to Congress for its review before the rule can go into effect. The statute provides: "*Before a rule can take effect*, the Federal agency promulgating such rule *shall submit* to each House of the Congress and to the Comptroller General a report containing—(i) a copy of the rule; (ii) a concise general statement relating to the rule, including whether it is a major rule; and (iii) the proposed effective date of the rule." 5 U.S.C. § 801(a)(1)(A) (emphasis added).

20.     Once a rule is submitted—and only then—Congress can review the rule and, if it disapproves of it, pass a joint resolution voiding the rule using streamlined procedures. According to the statute, the disapproval resolution may only be introduced during "the period beginning on the date on which the report . . . is received by Congress and ending 60 days thereafter." 5 U.S.C. § 802(a). Thus, if an

agency refuses to comply with the CRA's submission requirement, it denies our elected representatives their opportunity to consider the rule.

21.     Once a rule is submitted, each House of Congress has 60 legislative or session days (the House uses the term "legislative day," the Senate has "session days") to pass the joint resolution disapproving the rule. 5 U.S.C. § 802(a).

22.     Because these resolutions merely provide an up-or-down vote on the rule, they face fewer obstacles than other forms of legislation. In the Senate, resolutions of disapproval can (with 30 names on a discharge petition) bypass the relevant committees, are subject to a maximum 10-hours of floor debate, cannot be filibustered, and the resolution needs only a bare majority to pass. 5 U.S.C. § 802.

23.     If both Houses of Congress pass such a resolution, the joint resolution is sent to the President for his signature. *See* 142 Cong. Rec. S3683 (explaining that the Congressional Review Act provides for bicameralism and presentment to comply with the Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919 (1983)).

24.     If the President signs a joint resolution disallowing a rule, the CRA provides that the rule "shall not take effect[.]" 5 U.S.C. § 801(b). The agency is also barred from reissuing the rule "in substantially the same form" or issuing a new rule "that is substantially the same" as the disapproved rule, unless Congress has enacted legislation in the interim to "specifically authorize[]" it. *Id*.

25.     The CRA defines "rule" broadly to ensure democratic oversight of much of what administrative agencies do. A rule is "the whole or a part of an agency statement of general or particular applicability and future effect designed to

implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4); 5 U.S.C. § 804(3)(C). It has only a few narrow exceptions for rules "of particular applicability," "relating to agency management or personnel," and "of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties." 5 U.S.C. § 804(3)(C). Every other rule must be submitted.

26.      Despite the CRA's clear mandate that agencies must submit every new rule to Congress, and consequences for failing to do so, agency compliance has been inconsistent. Ten years after the statute was enacted, the Government Accountability Office found that agency compliance "was inconsistent" but appeared to be improving.[3] In 2009, a Congressional Research Service report found that agencies had failed to submit more than 1,000 substantive final rules adopted between 1999 and 2009.[4] More recent studies have reached similar conclusions.[5]

---

[3] J. Christopher Mihm, Government Accountability Office, Testimony Before the Subcommittee on Commercial and Administrative Law, Committee on the Judiciary, House of Representatives, *Federal Rulemaking: Perspectives on 10 Years of Congressional Review Act Implementation* (Mar. 30, 2006), https://www.gao.gov/assets/120/113245.pdf.

[4] *See* Curtis W. Copeland, Congressional Research Service, *Congressional Review Act: Rules Not Submitted to GAO and Congress* (Dec. 29, 2009), https://www.redtaperollback.com/wp-content/uploads/2017/04/CRS122909.pdf.

[5] *See* Philip A. Wallach & Nicholas W. Zeppos, Brookings Institute Report, *How powerful is the Congressional Review Act?* (Apr. 4, 2017), https://www.brookings.edu/research/how-powerful-is-the-congressional-review-act/ (finding that, among major substantive rules alone, 348 rules were not submitted).

### The Sage Grouse Rules

27.     In March, 2010, the United States Fish and Wildlife Service issued a finding that the greater sage-grouse was "warranted but precluded" for listing as a threatened or endangered species. This finding indicates that immediate publication of a proposed rule to list the species is precluded by higher-priority listing proposals. In its decision, the Fish and Wildlife Service determined that the inadequacy of regulatory mechanisms for monitoring sage steppe habitats was a significant threat to the greater sage-grouse.

28.     In response to the "warranted but precluded" finding, the Bureau and the Forest Service determined that they needed to incorporate "explicit objectives and concrete conservation measures" in plans for federal lands—"to protect, enhance, and restore [the greater sage-grouse] and its habitat and to provide sufficient regulatory certainty such that the need for listing the species under the [Endangered Species Act] can be avoided."[6]

29.     In December of 2011, Interior invited western states to develop state-specific management plans, citing the success of the Bureau's adoption of a Wyoming plan as an example. It promised each state that if it developed a plan that the agencies "concurred" with, it would be eligible for an exemption from the national management strategy. This process meant that each state would submit plans that agency officials would then review as part of the National Environmental Policy Act

---

[6] *See* Forest Service Great Basin ROD (Sept. 22, 2015), https://www.fs.fed.us/sites/default/files/sage-grouse-great-basin-rod.pdf.

planning process. Part of the process also included working with federal officials to try to reach compromises to accomplish the goals of protection of sage steppe habitat.

30.     Spurred on by this promise and to help avoid the listing, states, industry, property owners, and environmental groups worked together on these state-led conservation plans. This massive effort succeeded in addressing many of the threats to the greater sage-grouse, resulting in population growth between 2010 and 2015.

31.     For example, in Idaho the Governor put together a special task force comprised of industry leaders, working groups, conservationists, and state and local representatives to develop recommendations and policies to aid the State of Idaho with its plan.[7] The task force looked at the primary threats to sage-grouse within the state and developed comprehensive recommendations that would have successfully helped the federal government protect sage-grouse in the state. Based on the task force's detailed report the Governor drafted a plan to send to the federal government.[8] The plan called for three tiers of protection for the approximately 15 million federal acres in Idaho. Furthermore, the plan was based on scientifically proven methods for increasing sage-grouse populations in the state. In the spring of 2015, the Governor

---

[7] Idaho Governor's Sage-Grouse Task Force Recommendations (June 15, 2012), https://idfg.idaho.gov/old-web/docs/wildlife/SGtaskForce/FinalRecommendations.pdf.

[8] Draft Federal Alternative of Governor C.L. "Butch" Otter for Greater Sage-Grouse Management in Idaho (June 29, 2012), https://idfg.idaho.gov/old-web/docs/wildlife/SGtaskForce/draftAlternative.pdf.

signed an executive order implementing his sage-grouse plan on state land.[9] The plan was widely endorsed and accepted as a viable and sustainable plan for protecting the greater sage-grouse on federal, state, and even private lands.

     32.     Despite this, on September 22, 2015, the Bureau and Forest Service issued the Sage Grouse Rules, which consist of 98 related land use plans adopted in four simultaneously issued Records of Decision (RODs).[10] The Sage Grouse Rules

---

[9] Exec. Dep't of Idaho, Office of the Governor, Exec. Order No. 2015-04, Adopting Idaho's Sage-Grouse Management Plan (2015), https://gov.idaho.gov/mediacenter/execorders/eo15/EO%202015-04%20Sage-Grouse%20pdf.pdf.

[10] A Record of Decision (ROD) is a written public record that identifies and explains the reasoning for the agency's decision. In this case, the Bureau and Forest Service issued the RODs to explain the final land use plans or plan amendments for protecting the greater sage-grouse on Bureau and Forest Service lands. The four RODs include the United States Forest Service's Record of Decision and Approved Land Management Plan Amendments for the Great Basin Region Greater-Sage Grouse Sub-Regions of Idaho and Southwestern Montana; Nevada and Utah (Forest Service Sage Grouse Rule), https://www.fs.fed.us/sites/default/files/sage-grouse-great-basin-rod.pdf; Bureau of Land Management's Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region Greater Sage-Grouse Sub-Regions of Idaho and Southwestern Montana; Nevada and Northeastern California; Oregon; and Utah (Bureau Sage Grouse Rule), https://www.blm.gov/or/energy/opportunity/files/gbrod.pdf; Record of Decision and Approved Land Management Plan Amendments for the Rocky Mountain Region Greater Sage-Grouse Sub-Regions Northwest Colorado, and Wyoming (Forest Service Rocky Mountain ROD), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd527157.pdf; Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain Region Greater Sage-Grouse Sub-Regions of Lewistown, North Dakota, Northwest Colorado, and Wyoming; and Approved Resource Management Plans for Billings, Buffalo, Cody, HiLine, Miles City, Pompeys Pillar National Monument, South Dakota, and Worland (Bureau Rocky Mountain ROD), https://eplanning.blm.gov/epl-front-office/projects/lup/9506/63299/68541/Rocky_Mountain_Region_ROD_Worland.pdf.

explicitly rejected all of the state plans, denying every plan that had been filed with the federal government.[11]

33.     The four RODs are integrally related. Specifically, the Sage Grouse Rules state in the summary that they are "the culmination of an unprecedented planning effort" between the agencies "to conserve Greater Sage-grouse . . . habitat." The Rules practically mirror one another when establishing the framework, goals, and objectives that the plans are designed to meet. All four of the RODs expressly reference each other.

34.     On the same day the RODs were issued, the Fish and Wildlife Service determined that an endangered or threatened listing of the Greater Sage Grouse was not warranted.

35.     The RODs amend Bureau and Forest Service land use plans to limit or eliminate activities in sage-grouse habitat on federal lands. Because these plans differ from the state adopted plans, the result has been inconsistencies between state and federal management practices.

36.     The land use management plans were published in the *Federal Register* in 2015 after notice-and-comment rulemaking procedures. *See* 80 Fed. Reg. 57,639 (Sept. 24, 2015) (Bureau Rocky Mountain); 80 Fed. Reg. 57,633 (Sept. 24, 2015) (Bureau Great Basin); 80 Fed. Reg. 57,333 (Sept. 23, 2015) (Forest Service Great

---

[11] *See generally* Letter from Timothy M. Murphy, State Dir. of Bureau of Land Mgmt., to C.L. "Butch" Otter, Gov. of Idaho (Aug. 6, 2015), https://www.blm.gov/sites/blm.gov/files/BLM%20ID%20Response%20to%20Consist.pdf.

Basin); 80 Fed. Reg. 57,332 (Sept. 23, 2015) (Forest Service Rocky Mountain). They are rules under the CRA.

37.    Despite the CRA's clear mandate, the Bureau and Forest Service have not submitted the RODs for congressional review.

### Implementation of the Sage Grouse Rules

38.    The Forest Service has begun illegally implementing its Sage Grouse Rule.

39.    In the spring of 2016, the Forest Service Minidoka Ranger District completed "baseline" monitoring[12] of the Ranch's grazing allotments.

40.    In 2017, it continued to monitor the grazing allotments to assess riparian sage-grouse habitat suitability as part of the effort to implement the Sage Grouse Rule.

41.    Recently, the District released a report outlining where certain allotments fell short of the prescribed sage-grouse habitat markers set forth in the Sage Grouse Rule.[13] Forest Service biologists surveyed 470 locations throughout several grazing allotments in the Sawtooth National Forest to establish long term

---

[12]  Baseline monitoring typically involves measuring certain markers, like grass height, at the beginning of an experiment or project so that the Forest Service can compare any changes and draw scientific conclusions as to the cause of any differences in the future.

[13]  Scott Soletti, et al., *2017 Sawtooth National Forest, Minidoka Ranger District, Riparian Sage-Grouse Brood Rearing/Summer Habitat Assessment Framework Monitoring Report* (2017).

monitoring sites and identify land management activities affecting sage-grouse habitat.

42.     The Ranch operates in two of the allotments the Forest Service monitored for the report: the Rock Creek Allotment and the Coal Pit Allotment.

43.     According to the report, the Rock Creek Allotment had 105 sites surveyed. Approximately 50% of the sites were determined to be in good to excellent condition, 40% were in fair condition, with the remainder being deemed poor. The Coal Pit Allotment had 33 sites surveyed with 67% of the sites being deemed marginal and 33% deemed unsuitable.

44.     The Forest Service has held several meetings with permittees to review the Monitoring Report and talk about where the allotments fall short of compliance. While the Forest Service has not yet enforced any changes upon the permittees, the report identifies grazing as a "Priority Management Action[] for Consideration." It concludes that more intensive livestock management will likely improve the sites the quickest at the lowest cost to the district.

45.     Forest Service officials told the Ranch that "permit modifications will occur as soon as practical" and monitoring will continue in the 2018 season.[14] Modification of the permits could result in the Ranch having to find replacement pasture at a considerable cost, which could result in the Ranch going out of business.

---

[14]  Letter to Permittees regarding the Annual Operating Instruction Meeting from Loren Poppert, USFS District Ranger (Jan. 23, 2018).

46.     The Ranch is not aware of any current action the Bureau has taken to implement its Sage Grouse Rule on the Ranch's allotment. But, under the rule, the Bureau must meet certain goals and objectives related to rangeland conditions which are set under the Sage Grouse Rule. Consequently, the Ranch must make investments and grazing decisions today in anticipation of the Bureau complying with this obligation.

## The Sage Grouse Rules Affect Millions of Acres

47.     The Sage Grouse Rules have serious implications for those who depend on access to public lands across the west, particularly in states like Idaho, Nevada, and Utah, where federal agencies manage more than half of the land within the state. The Greater Sage-Grouse's range is estimated to be approximately 173 million acres, with 53% of that range in areas managed by the federal government.[15]

48.     Instead of considering the plans developed by the states, which took into account unique aspects of each individual state and its needs, the plans create a cookie-cutter approach that almost mirrors the stringent restrictions under the Endangered Species Act. This is despite the finding from the Fish and Wildlife Service that the Greater Sage-Grouse was not threatened or endangered.

49.     Congress has repeatedly criticized the rules and tried to overturn them through the traditional legislative process. However, the agencies' unlawful failure

---

[15] U.S. Fish & Wildlife Serv., The Greater Sage-Grouse Facts, figures and disclosures, *available at* https://www.fws.gov/greatersagegrouse/speciesinfo.php.

to submit the Sage Grouse Rules has deprived Congress of its best opportunity to review—and strike down—the rule.

## DECLARATORY AND INJUNCTIVE RELIEF IS APPROPRIATE

50.    All preceding paragraphs are realleged and incorporated herein by reference.

51.    An actual and substantial controversy exists between the Ranch and the Bureau and Forest Service over their failure to submit the Sage Grouse Rules to Congress as required by the CRA.

52.    This case is justiciable because the failure to submit the rules is agency action unlawfully withheld or unreasonably delayed, which has caused the Ranch, and will continue to cause, immediate and concrete injury. The Ranch's allotments have been subjected to monitoring under the Sage Grouse Rules and will continue to be subject to the rules' increasingly strict guidelines.

53.    If the Forest Service's failure to comply with the CRA is not declared unlawful and an injunction issued requiring the rules' submission, the Ranch will continue to be irreparably harmed. Currently, the Ranch is subjected to monitoring of its grazing allotments and threats of changes to grazing permits.

54.    The Ranch has no other plain, speedy, and adequate remedy at law.

55.    The Ranch's action is ripe and timely.

56.    Therefore, declaratory and injunctive relief is appropriate to resolve this controversy.

## CLAIM FOR RELIEF

### Agency Action Unlawfully Withheld or Unreasonably Delayed
### (5 U.S.C. § 706)

57.     The Sage Grouse Rules are a "rule" for purposes of the CRA. 5 U.S.C. § 551(4).

58.     The Sage Grouse Rules were not submitted to Congress before going into effect, as required by the CRA. *See* 5 U.S.C. § 801(a)(1)(A).

59.     Submission of the rules as required is "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706.

60.     Therefore, the Bureau and Forest Service must submit the Sage Grouse Rules to Congress pursuant to the CRA so that the rules may go into effect or, if Congress disapproves of the rule, be disallowed through a joint resolution.

## PRAYER FOR RELIEF

Plaintiff seeks judgment against Defendants as follows:

1.     For a declaration that submission of the Sage Grouse Rules to Congress under the CRA is agency action unlawfully withheld or unreasonably delayed;

2.     For a declaration that Defendants must submit the Sage Grouse Rules to Congress without delay;

3.     For an injunction requiring Defendants to submit the Sage Grouse Rules to Congress under the CRA; or that it stop implementing the rules if it fails to do so.

4.     For an award of the Ranch's cost of litigation, including, but not limited to, reasonable attorney's fees and expert witness fees, and fees and costs pursuant to 28 U.S.C. § 2412, or other applicable authority; and

5.      For such other relief as the Court may deem just and proper.

DATED: April 11, 2018.              Respectfully submitted,

                                    EDWARD DINDINGER
                                    JONATHAN WOOD
                                    TODD F. GAZIANO
                                    JEFFREY W. McCOY
                                    CALEB R. TROTTER
                                    KAYCEE M. ROYER


                                    s/ Edward Dindinger
                                    EDWARD DINDINGER

                                    Attorneys for Plaintiff Tugaw Ranches, LLC